TASHIMA, Circuit Judge,
concurring in part and dissenting in part.
I agree with the majority that Plaintiffs’ McCaskill-Bond claim is moot and that the portion of the district court’s decision addressing that issue should be vacated with instructions to dismiss that claim. I also agree that USAPA’s and US Airways’ cross-appeals should be dismissed. I believe, however, contrary to the majority, that Plaintiffs’ breach of the duty of fair representation claim should also be dismissed as moot. I, thus, would not reach the merits of that claim. If we do reach the merits, I disagree with the majority’s determination that USAPA breached its duty of fair representation. Moreover, even assuming USAPA breached its duty of fair representation, the misdirected injunction the majority imposes is erroneous and an abuse of discretion in view of the fact that USAPA is no longer a certified bargaining representative and, therefore, is not subject to the Railway Labor Act and can no longer be yoked with a duty of fair representation.
Accordingly, I dissent from Parts III, IV, and V of the majority opinion, except for those portions of Part V that address Plaintiffs McCaskill-Bond claim and the cross-appeals.
I.
To see how the duty of fair representation claim has become moot, one need only peruse the allegations of Plaintiffs’ First Amended Complaint (“FAC”) that relate directly to their claim that USAPA breached the duty of fair representation. First, *993 in their opening, introductory paragraph, Plaintiffs allege that they “file this complaint to enjoin Defendants from integrating the pilot operations in a manner that breaches Defendant USAPA’s duty of fair representation.” Then, 12 pages later, under “Claim One: Breach of the Duty of Fair Representation,” the FAC alleges:
97. Pursuant to the duty of fair representation, USAPA must have a legitimate union purpose to use anything other than the Nicolau Award list to integrate East Pilots and West Pilots.
98. USAPA does not have a legitimate union purpose to use anything other than the Nicolau Award list to integrate East Pilots and West Pilots.
99. USAPA, therefore, breached the duty of fair representation by entering into the MOU because the MOU abandons a duty to treat the Nicolau Award as final binding.
100. Plaintiffs are entitled to a declaratory judgment to that effect and to other remedy sought below.
The only injunctive relief sought in Plaintiffs’ Prayer for Relief is:
136. An injunction requiring Defendants to conduct seniority integration according to the MOU procedures but using the seniority order in the Nicolau Award list to order the US Airways pilots.
A1 of the allegations of the duty of fair representation claim are directed solely to the use of the “Nicolau Award to integrate East Pilots and West Pilots.” But USAPA can no longer “conduct seniority integration” because it has been overtaken by the US Airways/American Airlines merger, and conduct of the seniority integration proceedings is now the responsibility of APA, the bargaining agent for all pilots of new American Airlines, including both East and West Pilots.
To understand what it means to conduct seniority integration, we need look no further than the statute that governs seniority integration in airline mergers, the McCaskill-Bond Amendment to the Federal Aviation Act. McCaskill-Bond, which incorporates labor-protective rules established by the now-defunct Civil Aeronautics Board, requires unions and carriers to make “provisions ... for the integration of seniority lists in a fair and equitable manner.” Allegheny-Mohawk Merger, 59 C.A.B. 19, 45 (1972), incorporated by statute, 49 U.S.C. § 42112 Note. These provisions may include arranging for both negotiation and, if necessary, arbitration. Id.
When the West Phots first brought this action, USAPA was still a certified union and thus had statutory authority under McCaskill-Bond to make arrangements for how the seniority integration would be conducted. As laid out in their FAC, the West Pilots sought an injunction forcing USAPA to arrange seniority integration in a specific way: by merging the Nicolau Award and the American Airlines seniority list. The predicate of this claim was that using any list other than the Nicolau Award to order the US Airways pilots would be a breach of USAPA’s duty of fair representation.
. That option is now off the table. Because USAPA has since been decertified as a labor representative, it has no statutory authority to change or control how seniority integration will be conducted; only APA and the new American Airlines have that power. An injunction issued against USAPA cannot change the seniority integration procedure. Accordingly, the relief that the West Pilots actually sought in this action against their then-union can no longer be granted, rendering the case moot. See Gator.com Corp. v. L.L. Bean, Inc., 398 F.3d 1125, 1129 (9th Cir.2005) (en banc) (stating that a case is moot if “changes in the circumstances that prevailed at the beginning of litigation have *994 forestalled any occasion for meaningful relief’ (quoting West v. Sec’y of the Dep’t of Transp., 206 F.3d 920, 925 n. 4 (9th Cir.2000))).
The fact that the Seniority Integration Protocol Agreement (the “Protocol”) allows for a USAPA-delegated “merger committee” to present a position in the McCas-kill-Bond arbitration does not save this case from mootness. The role of USAPA’s merger committee is legally and functionally distinct from the former role of USA-PA as a union. As discussed above, the statutory role of a union is actually to conduct seniority integration, and the already agreed-upon Protocol lays out how that integration will be conducted. Under the terms of the Protocol, the USAPA-delegated merger committee may present an argument, but it cannot control the process or product of seniority integration.
The FAC did not seek an injunction addressing the merger committee or limiting what arguments the committee could present to the arbitrators. Nor could it have. The FAC was predicated entirely on USAPA’s duty of fair representation to the West Pilots, a duty which, by virtue of its decertification, it no longer has. See Dycus v. NLRB, 615 F.2d 820, 827 (9th Cir.1980) (“A labor organization that is not the exclusive representative of a bargaining unit ... owes no duty of fair representation to the members of the unit.”). No longer being the certified bargaining agent, USAPA is in no position “to conduct seniority integration” using the Nicolau Award or any other list. It also no longer is able to breach the duty of fair representation because it is no longer bound by such a duty. For these reasons, Plaintiffs’ duty of fair representation claim has become moot and should be dismissed.
II.
With respect to the merits of the duty of fair representation claim, the majority brushes aside the district court’s careful findings of fact, made after a full trial, and orders a misdirected injunction that has little connection to the issues in this case, or to the relief requested in Plaintiffs’ FAC, an injunction that exceeds the circumscribed role that we as a federal court may play in national labor disputes.
In view of the deference this court owes to USAPA as the then-certified bargaining representative, and to the district court as finder of fact, I would affirm the district court’s finding that USAPA did not breach its duty of fair representation. Given the different constituencies a union must represent, and the impossibility of pleasing them all, “[a] wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents.” Ford Motor Co. v. Huffman, 345 U.S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953). Noting the broad scope of discretion allotted to unions, the Supreme Court has repeatedly “analogized a union’s role to that of a legislature,” subject to similarly limited judicial review. Air Line Pilots Ass’n, Int’l v. O’Neill, 499 U.S. 65, 75, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991); Steele v. Louisville & Nashville R.R. Co., 323 U.S. 192, 198, 65 S.Ct. 226, 89 L.Ed. 173 (1944); see Rakestraw v. United Airlines, Inc., 981 F.2d 1524, 1532 (7th Cir.1992) (“O’Neill analogized the union’s choice to that of a legislature, subject to the most deferential judicial review.”). Although the actions a union may take are limited by the duty of fair representation it owes to each of its members, “[t]his duty is narrowly construed by the courts ... so that unions may act freely in what they perceive are the best interests of their members generally.” Jones v. Union Pac. R.R. Co., 968 F.2d 937, 941 (9th Cir.1992). Like the majority, I recognize that “[i]n the context of negotiating a seniority list, the prohibition on arbitrariness means that ‘a union may not juggle the seniority roster for no reason other than to advance one group of *995 employees over another.’ ” Maj. Op. at 984 (quoting Rakestraw, 981 F.2d at 1585). In other words, it is not the existence of an illegitimate motive that turns a union action into a violation of the duty of fair representation. It is, instead, the absence of any legitimate motive.
After a full bench trial on the merits, the district court determined that, although USAPA clearly had some improper motives, it was also motivated by at least one legitimate purpose: “securing the additional compensation contained in the MGU while putting off to another day the question of the appropriate seniority regime.” Securing additional compensation is a legitimate union purpose. See Maj. Op. at 988 (citing Baker v. Newspaper & Graphic Commc’ns Union, Local 6, 628 F.2d 156, 166 (D.C.Cir.1980)). A determination of motive constitutes a finding of fact by the district court, which we may overturn only if it is clearly erroneous. Woods v. Graphic Commc’ns, 925 F.2d 1195, 1199 (9th Cir.1991). Even under this deferential standard of review, the majority writes off the district court’s findings as clearly erroneous because “the district court did not point to a single piece of evidence supporting its conclusion” that “USAPA included Paragraph 10(h) for the purpose of obtaining benefits under the agreement.” Maj. Op. at 988. I strongly disagree.
Under the “clearly erroneous” standard, we must “defer to the lower court’s determination unless, based on the entire evidence, we are possessed of a ‘definite and firm conviction that a mistake has been committed.’” SEC v. Rubera, 350 F.3d 1084, 1093 (9th Cir.2003) (quoting Easley v. Cromartie, 532 U.S. 234, 242, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001) (emphasis added)). “So long as the district court’s view of the evidence is plausible in light of the record viewed in its entirety, it cannot be clearly. erroneous.” Id. at 1093-94. Thus, our duty does not end with the opinion of the district court; we must review the entire evidentiary record before overturning a factual finding with which we may disagree.
A.
The majority mischaracterizes what the district court found to be USAPA’s legitimate motive for including Paragraph 10(h) in the MOU. Contrary to the majority’s assertions, USAPA never claimed that Paragraph 10(h) was intended as a quid pro quo concession to extract additional compensation from American Airlines, and the district court never said it was. See Maj. Op. at 988-89. What the district court actually found was that Paragraph 10(h) was intended to prevent an internal struggle within USAPA’s membership, which could have jeopardized or delayed the ratification of the MOU and the additional compensation it offered. While USAPA was able to negotiate the MOU, it did not act with a free hand; the agreement would not become binding until ratified by the union’s membership. Thus, the majority is mistaken in treating securing additional compensation and preventing a “drag-out fight” as two separate justifications for USAPA’s action. They are two sides of the same coin: USAPA could not secure additional compensation for its employees if it could not get the MOU ratified, and it could not get the MOU ratified if the MOU implicated the seniority issues that had divided USAPA’s membership since 2007. There is ample evidence in the record to support the district court’s finding that USAPA feared that the benefits of the MOU might be jeopardized by implicating pilot seniority.[1] *996 The first place this motive is apparent is the language of Paragraph 10(h) itself. Contrary to the majority’s claims, Paragraph 10(h) did not “clearly favor[] one side in the intra-union dispute;” Maj. Op. at 988, or “relieve!] USAPA of any obligation it had to negotiate with the airlines and APA based on the Nicolau Award,” id. at 981. What the East Pilots have wanted all along is not two seniority lists, but a single seniority list based on date of hire. The West Pilots, meanwhile, wanted the Nicolau Award without any modification. Paragraph 10(h) gave neither side what it wanted.' In explicitly disclaiming any effect on pilot seniority, the MOU was, as the district court found, “explicitly neutral.” That finding is not clearly erroneous. In the coming McCaskill-Bond proceedings, the East Pilots would still have to convince an arbitration panel to abandon the Nicolau Award if they were ever to get the date-of-hire seniority regime they wanted. And if USAPA had remained the certified bargaining representative of US Airways’ pilots, it would still have been bound by the Nicolau Award to the same extent it was bound before the MOU was ratified.[2] It is USAPA’s decer-tification as the exclusive bargaining agent of the US Airways pilots, not Paragraph 10(h), that has relieved it of its duty to the West Pilots.
Had USAPA been truly opportunistic, it might have tried to include a provision in the MOU calling for date-of-hire seniority. Instead, Paragraph 10(h) ensured that the MOU gave neither the East Pilots nor the West Pilots what they wanted in terms of seniority, but gave both what they wanted in terms of compensation. USAPA’s decision to walk a middle road between the desires of the East and West Pilots strongly supports the district court’s finding that it acted in part from a desire to “rationally promote the aggregate welfare of employees in the bargaining unit.” Rakestraw, 981 F.2d at 1535.
The background against which the MOU was negotiated also supports the district court’s finding that Paragraph 10(h) was intended to be neutral in order to ensure the MOU could be ratified. The East Pilot’s hostility to the Nicolau Award was well known; it was how USAPA came to exist in the first place. Had the East Pilots feared the MOU would trigger the Nicolau Award, they would likely have fought the MOU and USAPA, just as they fought ALPA ini 2007.[3] And USAPA’s Board of Pilot Representatives had al *997 ready rejected a previous version of the MOU proposed by USAPA’s Negotiating Advisory Committee, indicating that those negotiating the MOU could not take approval for granted.
Finally, the district court’s finding that Paragraph 10(h) was meant to prevent a counter-productive fight finds support in the way in which the MOU was negotiated. The majority paints USAPA as a puppet of the East Pilots, scheming to advance their interests while “treating] the West Pilots as though they were nonunion members.” Maj. Op. at 986. In reality, USAPA delegated the negotiation of the MOU to a Negotiating Advisory Committee comprised of four union members, two of who were West Pilots and the remaining two East Pilots. When the MOU was put to a ratification vote, the West Pilots supported it in even greater numbers than the union at large: 75% of the total ballots east favored ratification, but among the West Pilots, 97.69% of those who voted favored ratification. Although none of the Negotiating Advisory Committee members testified as to the specific reason for including Paragraph 10(h), the fact that half of its members were West Pilots lends support to the district court’s finding that Paragraph 10(h) was not a naked power grab by the East Pilots. And the fact that West Pilots overwhelmingly ratified the MOU suggests that USAPA was not simply abandoning their interests. Cf. Gullickson v. Sw. Airlines Pilots’ Ass’n, 87 F.3d 1176, 1183 (10th Cir.1996) (“Legal authority holds ... that ratification of a seniority arrangement is a valid defense to complaints about a union’s actions in making that arrangement.”).
B.
The majority disregards USAPA’s legitimate fears about a ratification fight, rea-, soning that “USAPA may not point to a conflict of its own, unjustified creation to bootstrap its way to a legitimate union purpose.” Maj. Op. at 989. But the conflict over seniority is plainly not USAPA’s creation. The fight began in 2005 when US Airways and America West merged, and their pilots could not agree on a single, integrated seniority regime. It escalated in 2007 when an arbitration panel announced the Nicolau Award, satisfying the West Pilots but not the East Pilots. It was only after these events that a group of East Pilots decided to create USAPA to replace ALPA as their union. USAPA did not create the conflict; it inherited the conflict, just as APA has now inherited the conflict. USAPA is not the East Pilots. Had USAPA’s leadership decided to support the Nicolau Award, they had every reason to believe they would have been voted out like ALPA before them.[4] The conflict over seniority was a very real problem within USAPA’s membership, and it was not a problem USAPA created or could control.
Even if USAPA had some role in perpetuating the seniority controversy by not resolving it sooner, there is simply no support for the proposition that a union cannot justify its actions by referencing conditions it created. Instead, it is our duty to “evaluat[e] the rationality of a union’s decision in light óf both the facts and the legal climate that confronted the negotiators at the time the decision was made.” O’Neill, 499 U.S. at 78, 111 S.Ct. 1127 (emphasis added). The only decision at issue in this case is the decision to include Paragraph 10(h) in the MOU. No law required USA-PA to ignore the very real conflict that existed at the time the MOU was being negotiated.
In short, there is ample evidence to support the district court’s finding that USAPA acted, in part, from a legitimate *998 motive when it negotiated to include Paragraph 10(h) in the MOU. In holding that the district court’s findings of fact were clearly erroneous, the majority mischarac-terizes the district court’s decision and ignores the real threat that a ratification fight would have erupted if USAPA’s members believed the MOU would trigger an obligation to implement the Nicolau Award. Whatever faults USAPA might have, its decision not to link the MOU and the Nicolau Award was not “wholly irrational.” Id. (internal quotation marks omitted). On that ground alone, we should affirm.[5]
III.
After erroneously rejecting the district court’s well-supported factual findings, the majority goes on to order an injunction that is entirely disproportionate to — and untethered from — any relief requested in Plaintiffs’ FAC, any injury to the West Pilots, and in total disregard of USAPA’s current decertified status. “Injunctive relief is an extraordinary remedy and must be tailored to remedy the specific harm alleged.” McCormack v. Hiedeman, 694 F.3d 1004, 1019 (9th Cir.2012) (internal quotation marks and citations omitted). “The Supreme Court has cautioned that ‘injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.’ ” Id. (quoting Califano v. Yamasaki 442 U.S. 682, 702, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)). An injunction that forbids some future act is not an appropriate remedy “unless ‘there exists some cognizable danger of recurrent violation.’ ” United States v. Laerdal Mfg. Corp., 73 F.3d 852, 854 (9th Cir.1995) (quoting United States v. W.T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)).
A.
1.
Here, as the majority recognizes, USA-PA can no longer violate the duty of fair representation because it no longer has such a duty. See Maj. Op. at 990-91 (“[A] labor organization that is not the exclusive representative of a bargaining unit ... owes no duty of fair representation to the members of the unit.” (quoting McNamara-Blad v. Ass’n of Prof l Flight Attendants, 275 F.3d 1165, 1170 (9th Cir.2002)) (alterations in original)). Thus, the underlying basis for requesting injunctive relief to prevent future breaches of the duty of fair representation has been completely undercut: USAPA is no longer a certified bargaining representative under the Railway Labor Act. “The scope of the duty of fair representation is generally coextensive with the scope of the union’s statutory authority as the exclusive bargaining agent.” McNamara-Blad, 275 F.3d at 1169. “A labor organization that is not the exclusive representative of a bargaining unit ... owes no duty of fair representation to the members of the unit.” Dycus, 615 F.2d at 827. Nothing USAPA does in the McCaskill-Bond arbitration can violate a duty of fair representation because USAPA no longer owes such a duty to the West Pilots, the East Pilots, or anyone else.
The majority acknowledges that “[i]n an ordinary case,” USAPA’s decertification “would mean the end of [its] representa *999 tive authority.” Maj. Op. at 990 (emphasis added). Nonetheless, the majority implies that this is an extraordinary case in which a labor organization’s duty somehow survives its decertification as a union. In doing so, the majority cites no legal authority to suggest that a union’s duty can ever extend beyond its certification as a bargaining representative under the Railway Labor Act or the National Labor Relations Act. Indeed, no authority supports that position.
Rather, binding precedent makes it clear that the mere fact that USAPA has been invited to participate in the McCas-kill-Bond arbitration does not resuscitate its duty of fair representation. Although judicially crafted, the duty of fair representation is a “statutory obligation” that stems from the “statutory authority to represent all members of a designated unit” under the National Labor Relations Act or the Railway Labor Act. Diaz v. Int’l Longshore & Warehouse Union, Local 13, 474 F.3d 1202, 1205 (9th Cir.2007). “[T]he duty of fair representation is inextricably linked to the union’s status as exclusive bargaining representative in the collective bargaining process or in the administration of rights under a collective bargaining agreement.” Simo v. Union of Needletrades, Indus. & Textile Employees, Sw. Dist. Council, 322 F.3d 602, 614 (9th Cir.2003) (quoting Felice v. Sever, 985 F.2d 1221, 1228 (3d Cir.1993)). Although USA-PA may still be active in the MeCaskill-Bond proceedings, it is not the statutory exclusive bargaining representative of any pilots; that position is now held by APA. Moreover, USAPA has no right to participate “in the collective bargaining process or in the administration of rights under a collective bargaining agreement.” Id. (quoting Felice, 985 F.2d at 1228). Because USAPA can commit no further breaches of the duty of fair representation, there exists no “cognizable danger of recurrent violation,” and the majority’s injunction cannot be justified as preventing future harm. Laerdal Mfg. Corp., 73 F.3d at 854 (quoting W.T. Grant Co., 345 U.S. at 633, 73 S.Ct. 894). The majority has not cited a single case in which an affirmative injunctive duty was imposed on a certified bargaining agent after that agent had been decertified.
2.
Likewise, the majority’s injunction cannot be justified as undoing a previous breach of the duty of fair representation. Any injunctive relief “must be tailored to remedy the specific harm alleged.” McCormack, 694 F.3d at 1019 (quoting Park Vill. Apt. Tenants Ass’n v. Mortimer Howard Trust, 636 F.3d 1150, 1160 (9th Cir.2011)). There is no caselaw relaxing this requirement in the context of labor disputes.
The only duty of fair representation claim raised in the West Pilots’ FAC was that USAPA breached its duty of fair representation by entering into an MOU containing Paragraph 10(h). Any injunctive relief must therefore be crafted to remedy only the “specific harm” caused by that discrete union action. Id. (quoting Park Vill. Apartments Tenants Ass’n, 636 F.3d at 1160). On the record before us,- however, it is impossible to identify any specific harm suffered by the West Pilots that is clearly traceable to Paragraph 10(h). We cannot know whether the MOU would have been ratified without Paragraph 10(h), though history suggests that it would not have been. If the East Pilots had prevented ratification, the West Pilots would be worse off than they are now because there would still be two seniority lists, but they would not have received the additional compensation contained in the MOU.[6]
*1000 The majority fails to resolve the absence of a remediable harm. In fact, the majority desperately flails about in its attempt to identify a discrete injury traceable to Paragraph 10(h). It first states that “[t]he harm resulting from USAPA’s violation is the persisting absence of an integrated seniority list.” Maj. Op. at 991 (emphasis in original). But that, of course, is not the harm Plaintiffs complain they have suffered. The only harm Plaintiffs complain about is the absence of an integrated seniority list reflecting the Nicolau Award. The majority does not address this harm. The reason it doesn’t address it is because it concedes that there is no such traceable injury:
[W]e also recognize that it is not certain whether the Nicolau Award would have been implemented fully but for USA-PA’s breach. Because a good faith attempt to implement the Nicolau Award would have ultimately required a ratification vote by all pilots, and we cannot know what the results of such a vote would have been, we can never be certain whether efforts to implement the Nicolau Award through a collective bargaining agreement with US Airways would have succeeded.
Id. at 991 (emphasis added). In one breath, the majority claims that the harm to be remedied is the absence of a seniority list, a harm about which Plaintiffs have not complained, and in the next, it admits that it cannot, in any event, trace the absence of such a seniority list to USA-PA’s actions. This is a virtual admission that there is no continuing harm traceable to USAPA’s breach of the duty of fair representation to be remedied by an injunction. In the absence of any clear and identifiable injury to the West Phots, it is impossible to craft a properly tailored injunction. The majority’s resort to injunc-tive relief to remedy a speculative (and likely imagined) harm is inappropriate.[7]
B.
Even if the majority were correct to afford injunctive relief, the specific injunction the majority orders is inappropriately broad and goes well beyond what would be required of USAPA even if it were still the certified bargaining representative for the US Airways Pilots. Because “[a]n injunction should be ‘tailored to eliminate only the specific harm alleged,’ ” Skydive Ariz., Inc. v. Quattrocchi, 673 F.3d 1105, 1116 (9th Cir.2012) (quoting E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1297 (9th Cir.1992)), we have repeatedly warned district courts that an “overbroad” injunction is an abuse of discretion, see, e.g., Rodriguez v. Robbins, 715 F.3d 1127, 1133 (9th Cir.2013); McCormack, 694 F.3d at 1019; Stormans, Inc. v. Selecky, 586 F.3d 1109, 1119 (9th Cir.2009). As discussed above, it is far from clear on the record that there is in fact an injury to be remedied through an injunction or, for that matter, what exactly the majority believes is the injury to be remedied.
The majority “conclude[s] that injunctive relief is necessary and appropriate in this case to prevent the East Pilots from continuing to enjoy the benefits of USAPA’s *1001 breach at the expense of the West Pilots.” Maj. Op. at 991. But the majority never tells us what those “benefits” are. The only “benefit” and the only assertion that USAPA breached its duty of fair representation, would be in the makeup of the pilot seniority list. But that list has never been drawn up. The majority appears to recognize as much, continuing, “Although there remains some ambiguity over whether the Nicolau Award would have been adopted in toto, to conclude, as does the dissent, that the West Pilots may not obtain any relief at all is to grant USAPA the benefit of doubt that USAPA itself created.” Id. But my purpose is not “to grant USAPA the benefit of doubt,” but to grant it to the district court’s findings of fact, as the clearly erroneous standard of review requires. Just as important, I would grant that benefit to the McCaskill-Bond pilot seniority integration proceeding so that the arbitration board can conduct a proceeding of its own design.
While the majority leaves the exact text of an injunctive order for the district court to decide on remand, its instructions will require the district court to issue an over-broad injunction. The majority directs the district court “to enter an order enjoining USAPA from participating in the McCas-kill-Bond seniority integration proceedings, including any seniority-related discussions leading up to those proceedings, except to the extent that USAPA advocates the Nicolau Award.” Maj. Op. at 991. Put differently, USAPA will have only one task: advocating the Nicolau Award.
This remedy bears no relation to the purported harm. Even if the Nicolau Award had been implemented, USAPA would still be free to advocate for any seniority regime: because USAPA is no longer a certified bargaining representative, it does not owe a duty of fair representation to any pilots. Dycus, 615 F.2d at 827. By forcing USAPA to advocate for the Nicolau Award, the majority puts USAPA in a far more limited position than it would have been in even if the Nicolau Award had been implemented as the West Pilots wanted.
Moreover, even if USAPA were still a certified bargaining representative for the former US Airways Pilots, it would have had far greater leeway to craft its position in arbitration than the injunction will provide it. USAPA would still be free to suggest any proposal that “rationally pro-motets] the aggregate welfare of the employees in the bargaining unit,” Rakestraw, 981 F.2d at 1585, and its decisions would be “subject to the most deferential judicial review,” id. at 1532. Instead, the majority instructs USAPA to become unwavering partisans of the Nicolau Award, forsaking all other concerns. On the other hand, the injunction will have no restraining effect on any of the other participants in the McCaskill-Bond arbitration, including the West Pilots who, undoubtedly, will press for a Nicolau Award-type of seniority list.
Such a sweeping injunction also needlessly hamstrings USAPA’s ability to put forward a position on the key question at issue in the arbitration: how to combine the US Airways seniority lists with the pre-merger American Airlines seniority list. The phrasing of the majority’s instructions to the district court makes it unclear whether USAPA will be allowed to put forth a position on merging the lists at all, since doing so has nothing to do with “advocating] the Nicolau Award.” Maj. Op. at 991. If USAPA does try to put forward a position on integration with the pre-merger American pilots, its efforts will no doubt by hindered by concerns about whether any given position goes beyond advocating the Nicolau Award. And the arbitrators, knowing USAPA is being *1002 coerced by a court order, will have little reason take its suggestions seriously. The majority’s injunction, which will effectively eliminate USAPA’s ability to function as a significant participant in the seniority integration proceedings, is overbroad. This is especially true because the West Pilots will be a participant in the McCaskill-Bond arbitration free to press their case in favor of the Nicolau Award without restraint and without fear of any counterarguments being made by USAPA.
C.
Setting aside the issues of tailoring and overbreadth, the injunction the majority imposes is an unwise judicial attempt to influence the McCaskill-Bond arbitration board. Regardless of what this court orders, the arbitration board will have the full and final power to craft the joint seniority list for the post-merger American Airlines on whatever basis it finds fair. And the arbitration board will be free to give Nicolau Award as much or as little weight as it sees fit. The fact that this court has forced USAPA to promote the Nicolau Award will not serve to make the Nicolau Award seem any more or less appropriate to the arbitration board. Thus, there is ultimately very little to be gained from the majority’s injunction.
On the other hand, the injunction has the potential to work significant mischief. APA designated three merger committees to participate in the upcoming arbitration: USAPA, a West Pilot merger committee, and a merger committee representing the pilots of the pre-merger American Airlines. As the majority notes, APA likely intended the USAPA merger committee to represent the interests of the East Pilots. Maj. Op. at 990-91. By designating one merger committee to represent each distinct group of pilots, APA sought to “ensure that the interests of all pilots [would] be properly represented” in the seniority list integration proceedings. In the Matter of the West Pilots’ Request for a Merger Committee, Preliminary Arbitration Board Award at 16 (Jan. 9, 2015). This was more than a kind gesture; it was an effort by APA to comply with its legal obligation to make “provisions ... for the integration of seniority lists in a fair and equitable manner.” Allegheny-Mohawk Merger, 59 C.A.B. at 45.
By cutting off USAPA’s speech rights, the majority upsets this balance. For all those pilots who were part of US Airways, but not the West Pilots, there will be no voice to represent them before the McCas-kill-Bond arbitration board. Advocating a date-of-hire seniority list as a committee representing a specific group of affected pilots within a larger union cannot be equated, as the majority does, with acting as a certified bargaining representative subject to a duty of fair representation. There is simply no justification for such judicial interference with the McCaskill-Bond proceedings, the aim of which is to give all affected pilot groups a voice in the proceeding and to reach a fair and equitable resolution of the pilot seniority issue.[8]
IV.
Because USAPA is no longer certified to represent the US Airways pilots, including the West Pilots, under the Railway Labor Act, this court cannot give the West Pilots the relief they seek in their FAC; this case is therefore moot. Regardless, the *1003 district court’s finding that USAPA included Paragraph 10(h) in the MOU to prevent a counterproductive struggle is not clearly erroneous, and the district court’s decision on Plaintiffs’ duty of fair representation claim should be affirmed. Instead, the majority imposes a speech-restricting injunction made of whole cloth that has no legal basis, and may ultimately do more harm than good.
I respectfully dissent from Parts III, IV, and the portion of Part V directed to the duty of fair representation claim and to the award of attorneys’ fees.

. What matters is not whether or not USAPA could have received additional compensation without the need for Paragraph 10(h); what matters is whether USAPA, in exercising its judgment, actually believed Paragraph 10(h) would help forestall a fight that could endan *996 ger or delay the increased compensation. It is not the place of the courts to second-guess a union’s exercise of judgment. Beck v. United Food & Commercial Workers Union, Local 99, 506 F.3d 874, 879 (9th Cir.2007).

. The majority fails to explain exactly what obligation USAPA had "to negotiate with the airlines and APA based on the Nicolau Award,” or how Paragraph 10(h) removes that obligation. Maj. Op. at 981. The last time this case was before us, we noted that "USAPA [was] at least as free to abandon the Nicolau Award as was its predecessor, ALPA.” Addington v. U.S. Airline Pilots Ass'n (Addington I), 606 F.3d 1174, 1181 (9th Cir.2010). Nothing in Paragraph 10(h) — or the entire MOU for that matter — claims to supersede the prior Transition Agreement or the Nicolau Award. Thus, whatever duty USAPA inherited from ALPA with respect to integrating the East and West pilots survived the MOU, and now, presumably, rests with APA.

. We previously recognized the unlikelihood that the East Pilots would ever ratify an agreement supporting the Nicolau Award, even if it were proposed by USAPA. See Addington I, 606 F.3d at 1180 ("ALPA had been unable to broker a compromise between the two pilot groups, and the East Pilots had expressed their intentions not to ratify a CBA containing the Nicolau Award. Thus, even under the district court's injunction mandating USAPA to pursue the Nicolau Award, it is uncertain that the West Pilots' preferred seniority system ever would be effectuated.”).

. See note 3, supra.

. The majority states, “Contrary to the dissent’s view that Paragraph 10(h) was neutral, reflecting USAPA's 'decision to walk a middle road,’ we conclude that the history of this makes clear that it was anything but.” Maj. Op. at 989 n. 9. While I concede that, were the majority the fact finder, the record plausibly supports such a finding, the issue is whether the district court clearly erred in finding otherwise. It did not. Among the evidence the majority ignores is that the West Pilots voted to approve the MOU, including Paragraph 10(h), almost unanimously — by a 97.69% favorable vote.

. It is also speculative whether an MOU not containing Paragraph 10(h) would have re *1000 quired USAPA to implement the Nicolau Award at all. The West Pilot’s contention is that, but for Paragraph 10(h), the MOU would have triggered a duty to implement the Nico-lau Award stemming the Transition Agreement executed during the US Airways-America West merger. Thus, deciding what effect the MOU would have had absent Paragraph 10(h) requires interpreting the Transition Agreement, an analysis which the majority fails to undertake.

. Recall also that we have previously observed that "even under [an] injunction mandating USAPA to pursue the Nicolau award, it is uncertain that the West Pilots' preferred seniority system ever would be effectuated.” Addington I, 606 F.3d at 1180.

. The majority-injunction’s interference with the McCaskill-Bond arbitration proceeding is broad. In effect, it ties the hands of the arbitration board as to the scope of the evidence it can hear; it bars the arbitration board from hearing any evidence of the East Pilots position. Such judicial interference with an arbitration board’s pre-trial decision on the scope of evidence it chooses to hear is unprecedented.